**R.B. WRIGHT CONSTRUCTION CO.,**
**Through Its Subcontractor,**
**REMBRANT, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 90–1188.

United States Court of Appeals,
Federal Circuit.

Nov. 20, 1990.

Pete Kulmala, Ness, Motley, Loadholt, Richardson & Poole, Barnwell, S.C., argued, for appellant.

Scott Ray, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee. With him on the brief were Stuart E. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Anne W. Westbrook, Asst. Dist. Counsel, Dept. of the Army, Savannah, Ga., of counsel.

Before PLAGER and LOURIE, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The sole question in this case, here on appeal from the Armed Services Board of Contract Appeals (Board), is whether a government contract that required the contractor to apply three coats of paint contained an implied exception for previously-painted surfaces which, according to the contractor, required only two coats. The Board held that the contract was unambiguous and required three coats. We affirm.

I

A. The appellant Wright entered into three contracts with the government for miscellaneous repairs, including painting, to approximately 200 World War II-era barracks and office buildings at Fort Gordon, Georgia. A single architect-engineer designed the plan, but due to funding requirements seven contracts were awarded for the work. The three contracts awarded to Wright contained drawings identifying the areas to be painted and specifications detailing the surface preparation, type of paint, and number of coats for each surface to be painted. The great majority of the surfaces to be painted had been previously painted.

Each contract contained a specification section 9P2A, Painting, General. Paragraph 14 of 9P2A read:

14. SURFACES TO BE PAINTED: Surfaces listed in the PAINTING SCHEDULE, other than those listed in paragraphs SURFACES NOT REQUIRING PAINTING and SURFACES FOR WHICH PAINTING IS PROHIBITED, will receive the surface preparation, paints, and number of coats prescribed in the schedule.

Paragraph 18 provided:

PAINTING SCHEDULE: The PAINTING SCHEDULE prescribes the surfaces to be painted, required preparation, and the number and types of coats of paint....

The painting schedule contained five columns listing, for each of various surfaces, the type of surface preparation, and specifying the type of paint for three coats. A typical example was as follows:

| Surface | Surface Preparation | 1st Coat | | 2nd Coat | | 3rd Coat |
|---|---|---|---|---|---|---|
| Exterior wood surfaces not otherwise specified | As previously specified | MIL–P–28582 [which the record shows was a "Primer Coating"] | | Exterior oil paint or TT–P–19 or TT–P–1510 | | Exterior oil paint TT–P–19 TT–P–1510 |

For a number of surfaces, however, the schedule stated "None" under the listing for the "3rd Coat." For example, one item read:

| Surface | Surface Preparation | 1st Coat | | 2nd Coat | 3rd Coat |
|---|---|---|---|---|---|
| Exterior ferrous surfaces, exposed, unless otherwise specified | As previously specified | TT–E–489 Class A or TT–E–1593 | | TT–E–489 Class A TT–E–1593 | None |

The painting schedule had 38 separate items for different surfaces, 26 of which specified "None" for the "3rd Coat." The surfaces listed in the painting schedule included wood, ferrous, concrete, metal and plaster.

B. After the work on the first building had been completed, the government discovered a previously-painted wall that, in its opinion, had not been properly repainted (its old color, purple, could still be seen). The government learned that Rembrant, Wright's painting subcontractor and the real party-in-interest, had applied only one coat of paint to the wall and to other previously-painted surfaces. In accordance with

its interpretation of the contract, the government ordered Wright to (1) apply three coats of paint to every surface where—according to the painting schedule and without regard to whether it had been previously painted—three coats were required, or (2) give it credit for any work not performed. Upon Wright's request, Rembrant performed the work as the government directed.

Rembrant viewed the additional painting as extra work not required under the contracts, and submitted claims to Wright for the extra cost. Wright in turn submitted the claims to the government, with its own additions for overhead and profit. The contracting officer denied the claims.

Wright filed, on behalf of Rembrant, a timely appeal to the Board. Before the Board, Wright argued that the painting schedule did not apply to previously-painted surfaces, but only to unpainted ones, and that the painting of previously-painted surfaces constituted extra work under the contracts, for which it was entitled to additional compensation. Wright claimed that in so interpreting the contract, Rembrant properly relied upon customary practice in the painting business and the needs of each particular surface.

A five-member panel of the Board, one member dissenting, denied the appeals. The Board held that section 9P2A and the painting schedule unambiguously specified the requirements for both previously-painted and unpainted surfaces:

> Paragraph 14 of the painting specification 9P2A imposed an unqualified requirement that *all* surfaces listed in the painting schedule (other than those expressly excepted) must receive the preparation, paints, and number of coats specified in that schedule. No exception or differentiation was made as to previously painted walls....
>
> Given the unqualified requirement of the painting schedule, we conclude that the contract was clear on its face. The painting schedule unambiguously required three coats of paint for all surfaces mentioned....

*R.B. Wright Constr. Co.*, 90–1 B.C.A. (CCH) ¶ 22,364, at 112,351 (ASBCA 1989) (emphasis in original).

## II

■ The sole question is whether the contractual requirement that three coats of paint be applied to specified surfaces contains an implied exception that only two coats were required when the surface had been previously painted. Since contract interpretation is a question of law, the Board's interpretation is not binding upon us. 41 U.S.C. § 609(b) (1988); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987); *American Elec. Laboratories, Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985). But because of the Board's expertise on questions of government contracts, we give some weight to the Board's interpretation of particular contractual language. *Cf. United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed.Cir.1987); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985).

■ We agree with the Board that the contract was unambiguous in requiring three coats and contained no implied exception for previously-painted surfaces.

A. Paragraph 14 of section 9P2A specified that "Surfaces listed in the PAINTING SCHEDULE ... will receive the ... number of coats prescribed in the schedule." This unequivocal language does not indicate, or even suggest, that it does not apply to previously-painted surfaces. Paragraph 18 provided that "The PAINTING SCHEDULE," not industry practice or Rembrant's view of what constituted necessary and proper painting, "prescribes ... the number and types of coats of paint...."

The painting schedule provided generally for three coats of paint, and contained an exception only for those surfaces for which "None" was specified as the type of paint. Nothing in the schedule suggests that, in addition to the 26 surfaces for which no third coat was required, there was an implied exception to the three-coat requirement for any surface that previously had

been painted. To the contrary, the three-coat requirement applied to all surfaces, whether previously painted or unpainted. As the Board stated:

> The Board has previously held, in a case involving a similar issue as to required coats of paint, that reference to a gypsum board 'surface' in a painting schedule does not exclude a previously painted gypsum board surface. *F.E. Constructors (JV)*, ASBCA No. 23049, 82–1 BCA ¶ 15,640.

As the Board found, "the great majority of the surfaces to be painted were previously painted." *R.B. Wright Constr. Co.*, 90–1 B.C.A. (CCH) ¶ 22,364, at 112,349 (ASBCA 1989). In view of that fact, and the detail in which the painting schedule specified the number of coats and the type of paint for each of 38 different surfaces, it is difficult to believe that if the government also had intended to except from the three-coat requirement any surface that previously had been painted, the contract would not have explicitly and unequivocally said so. Indeed, if the contractor believed that the contracts did not, or could not, mean what they said, it could have inquired of the government before executing the contracts. The record does not establish, as Wright contends, that such an inquiry would have been futile in this case.

The Board stated, although it found it unnecessary to make findings on the point, that Rembrant presented the following testimony "regarding the basis of its bid":

> It based its bid on the plans, which stated what surfaces were to be painted, and on the paint schedule in the specifications, not for the number of coats on existing painted walls but for the required type of paint for the finish coat and for any undercoating needed (tr. 1/101–03). It bid on the basis of 1½ coats for previously painted walls (tr. 1/87). In some cases, it felt only the finish coat was needed; in others, spot priming, a full intermediate coat, and the full finish coat. The 1½ coats bid was an average (tr. 1/88).

*Id.*

Since, in preparing its bid, Rembrant apparently ignored the requirement in the painting schedule that three coats were required except where the schedule provided otherwise, and instead relied on its own judgment concerning the number of coats that was necessary, it is in a weak position now to seek additional compensation for being required to apply the three coats that the contract specified. *Cf. Liebherr Crane Corp. v. United States*, 810 F.2d 1153 (Fed. Cir.1987). There a contractor, in submitting a bid to supply two cranes, read only three or four pages of a 98–page specification and, based upon that reading, erroneously assumed that it could perform the contract by supplying its standard cranes. In denying the contractor's request that the contract be reformed to increase the price to reflect the higher cost that compliance with the specifications caused, the court stated that the allegedly mistaken bid "cannot be said to have resulted from a 'misreading of the specifications.' To the contrary, Liebherr's errant bid clearly resulted from Schiller's gross negligence in failing to read and consider the specifications thoroughly." *Id.* at 1157.

The case is distinguishable from the present one in several respects. It is similar, however, in that here, too, in formulating its bid, the contractor ignored the requirement in the painting schedule for three coats and instead erroneously assumed that the contract required only the application of as many coats for previously-painted surfaces as the painting subcontractor deemed necessary. As *Liebherr Crane* indicates, in such circumstances the contractor is not entitled to an increase in the contract price.

■ Wright stresses that some requirements of the contract (e.g., a primer and two coats on previously-painted surfaces) were wasteful, imprudent, and/or did not conform with customary practice. Neither a contractor's belief nor contrary customary practice, however, can make an unambiguous contract provision ambiguous, or justify a departure from its terms. *Cf. Northwestern Indus. Piping, Inc. v. United States*, 467 F.2d 1308, 1314 (Ct.Cl.1972). As the Board stated:

The Government is entitled to receive what it has contracted for, even if that exceeds what is absolutely needed for a satisfactory result. If appellant or its subcontractor thought the first of the three coats specified was not needed, or that even the second coat in some instances was not needed, they were not entitled unilaterally to omit those requirements from the bid and perform the job in accordance with what they believed was an adequate minimum. Unless they sought and obtained a change in the specifications before bid opening, they were bound to perform the contract in accordance with its clear requirements.

*R.B. Wright Constr. Co.*, 90–1 B.C.A. (CCH) ¶ 22,364, at 112,351 (ASBCA 1989).

B. The contracts included a standard "Omissions and Misdescriptions" clause, which in relevant part provided:

Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work, but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

Wright argues that the draftsman of the contract overlooked the problem of painting previously-painted surfaces, and that since the Omissions and Misdescriptions clause required it to perform "details of work" not specified in the contract but that "are customarily performed," it properly relied on the customary practice of the painting business that a primer coat is not applied to previously-painted surfaces. Nothing in the record, however, supports the factual predicate of this argument that the contract's silence with respect to painting previously-painted surfaces was an oversight. As we hold, the contract unequivocally and unambiguously required three coats of paint except where specifically excluded—where the "3rd Coat" column of the painting schedule stated "None."

Although the record does not explain why the government required three coats on previously-painted surfaces, there is a reasonable explanation for that requirement. The contract required painting of approximately 200 buildings, all more than 40 years old. The government may have decided that rather than inspecting the numerous surfaces of each structure and determining which of the previously-painted surfaces required three coats, or leaving that decision to the contractor, it would be wiser and easier to require three coats on all surfaces, whether previously painted or not, even though that course would increase its costs.

In any event, Wright's argument rests upon a misinterpretation of the Omissions and Misdescriptions clause. The clause does not permit the contractor to depart from the terms of the contract in order to follow industry practice. The clause requires the contractor to perform "details of work" that are omitted from the drawings and specifications and that are "manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed." In other words, the clause requires the contractor to perform additional work not explicitly specified in the contract that is necessarily or customarily a part of the work the contract covers. The clause, however, does not authorize a contractor to do less than the contract requires on the ground that the lesser work is customary in the trade.

## CONCLUSION

The decision of the Board is

AFFIRMED.

PLAGER, Circuit Judge, dissenting.

I respectfully dissent. This is not so much a problem of legal interpretation as it is of common sense. The contract at issue involved repainting walls in old barracks and office units at Fort Gordon, Georgia. Likely enough there was already more paint on the walls than there was wall. The Corps of Engineers divided the project

into seven contracts "due to funding requirements," which in some circles means to avoid a dollar total that would require higher review and authority. In this case, such review might have avoided the whole problem.

The contract—written in usual bureaucratese—included a complex paint schedule apparently better suited for new construction than previously painted buildings. It generally called for the application of three coats, the first coat specified to be a primer, the second and third were finish coats. The schedule was based on the construction material of the surface to be painted. Nothing in the schedule accounted for the fact that the walls had previously been painted, yet, as anyone who has ever painted a living room wall knows, it is not a good idea to put primer over preexisting finish coats, or latex based paint over acrylic or oil paint. It is not only a waste of money, but may contribute to early peeling and deterioration of subsequently applied coats.

The painting subcontractor, Rembrant, Inc., in keeping with his name, if not his spelling, knew a little about painting and conformed his painting activities to the wall surfaces, not the schedule. Rembrant's approach came to naught when a wall previously painted purple—there is no accounting for taste—was painted over but the purple showed through. It was then that the Government's contracting officer (CO) discovered that Rembrant was not adhering religiously to the paint schedule. Instead of inspecting the work and requiring additional coats where needed, the CO insisted on absolute fidelity to the schedule whether warranted by the condition of the work or not.

The contract's omissions clause, addressed in part II, B. of the majority opinion, requires the contractor to perform "omitted or misdescribed details of the work ... as if fully and correctly set forth and described...." The Government by this clause claims protection from its own mistakes; it is only fair that on these facts

the same clause protects the contractor who bids and performs on the basis of common sense, and is then told that to ignore the misdescribed details is wrong. That the CO knew there was a problem with the paint schedule became obvious during oral argument. Discussion revealed that the CO at first insisted on strict adherence to the schedule and total disregard for the type of paint already on the surface, which would have required putting a layer of latex paint over an acrylic layer. After being convinced that such a combination would result in an inferior finished product, the CO did waive that part of the requirement.[1]

This is not a case of statutory construction, in which we owe deference to the will of Congress. This is a case of a contract poorly drafted by the Government, administered by a mentality more rigid than the walls being painted, and enforced by a Contract Appeals Board, over a strong dissent, that acted as if there was no context to the contract.

By its approval of the Appeals Board's mechanical reading of the contract, the majority creates a negative incentive for the Government to invest resources in getting its contracts right in the first instance, and diverts resources into contract performance which even the Government does not want, or which at best produces marginal benefits compared to the costs incurred. I would hold enforcement of the literal terms of this contract under these circumstances unconscionable and reverse the decision for the Government. If the Government wants to do foolish things, it should pay for its foolishness.

---

1. Presumably, if Rembrant adhered to the schedule the paint would not adhere to the wall, and Rembrant would be required to repair any peeling paint at its own expense.