**METRIC CONSTRUCTORS, INC., Appellant,**

v.

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, Appellee.**

No. 98–1156.

United States Court of Appeals, Federal Circuit.

March 3, 1999.

Eric M. Drattell, McDermott, Will & Emery, of Washington, DC, argued for appellant.

F. Jefferson Hughes, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David M. Cohen, Director and Sharon Y. Eubanks, Deputy Director.

Before RICH, PLAGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

The National Aeronautics and Space Administration (NASA) awarded a $56,215,000 contract to Metric Constructors, Inc. (Metric) for construction of the Space Station Processing Facility (SSPF) at the Kennedy Space Center in Florida. On December 10, 1993, NASA issued a contract modification deleting a contract requirement to install new light bulbs before project completion. NASA deducted $132,570 from the contract for the deleted work. When Metric appealed, the Armed Services Board of Contract Appeals (Board) upheld this deduction. *See* ASBCA No. 48852 (Nov. 21, 1997). Because the Board erred in construing the contract to require replacement of all lamps before project completion rather than replacement of only burned out, broken, or defective lamps, this court reverses.

I.

NASA awarded the contract to construct the SSPF on February 15, 1991. The SSPF, completed in June 1994, consists of approximately 500,000 square feet and contains offices, computer and communications facilities, clean rooms, bays for processing space station payloads, and a parking lot. Approximately 13,000 light bulbs (referred to as "lamps" in the industry) light these areas. In March 1991, Metric entered into a subcontract with Meisner Electric, Inc. (Meisner) to perform the electrical work described in the specifications of the contract. At issue are

three sections of those specifications relating to the installation of lamps.

Section 16511, entitled "Fluorescent Fixtures," required:

3.1 Installation

. . . . .

A fixture shall be installed at each outlet indicated on the drawings, and lamps of the proper type and wattage shall be installed in each fixture.

New lamps shall be installed immediately prior to completion of the project, unless directed by the designated NASA representative.

Section 16517, entitled "High Intensity Discharge Lighting," required:

3.1 Installation

. . . . .

A fixture shall be installed at each outlet indicated, and lamps of the proper type, voltage, and wattage shall be installed in each fixture.

New lamps shall be installed immediately prior to completion of the project, or earlier if construction conditions dictate.

Section 16531, entitled "Parking Lot and Roadway Lighting," required:

3.2 Installation

. . . . .

New lamps shall be installed immediately prior to completion of the project unless construction conditions indicate otherwise.

Metric and Meisner interpret these sections to require replacement of only defective, burned out, or broken lamps immediately before project completion. NASA contends that they require replacement of all lamps, known as "relamping" in the industry, before project completion.

The parties discovered their divergent views when NASA performed a "walkdown" of the project on September 20, 1993. Under the terms of the contract, NASA planned to take possession of several rooms in the facility in October 1993, known as early completion date (CD) rooms. NASA conducted the walkdown to identify items requiring completion before delivery of the CD rooms. The resulting NASA punchlist identified relamp-

ing as a requirement. The relamping requirement appeared on subsequent punchlists of September 27 and October 4, 1993.

In response to the punchlists, Meisner sent a letter to NASA on October 19 noting NASA's request for relamping, but maintaining that "[r]emoval and replacement of florescent [sic] lamps in fixtures that have been installed for CD is wasteful and not required. The fixtures have just recently been installed and the lamps are fine." In response to Meisner's letter, the contracting officer issued Modification 1345 on December 10, unilaterally deleting "the contract requirement to install new lamps prior to completion of the project ... as set forth in specification Sections 16511,3.1, 16517,3.1, and 16531,3.1."

After several months of unsuccessful negotiations about the amount of credit due NASA for deleting the relamping requirement, Metric and Meisner informed NASA that they did not interpret the original contract to require relamping. Accordingly they suggested that Modification 1345 cost nothing. After more negotiation, the contracting officer, on October 4, 1994, issued Modification 1476 unilaterally reducing the contract price by $132,570 for the work deleted by Modification 1345.

Metric then submitted a claim to the contracting officer seeking recovery of the credit taken by NASA. When the contracting officer issued no decision, Metric appealed to the Board asserting its competing interpretation of the contract and, in the alternative, alleging numerous deficiencies in NASA's calculation of the $132,570 credit. In particular, Metric produced evidence showing that trade practice and custom, as well as the conduct of both parties, supported its interpretation. The Board accorded this evidence no weight "in light of the clear words" of the contract. According to the Board, the contract unambiguously required relamping the facility.

Aside from the purportedly clear language of the contract, the Board relied on two other grounds in support of its decision. First, it concluded that Metric's interpretation of the specifications to require replacement of only defective, burned out, or broken lamps would render those specifications meaningless in

light of the warranty provision in the contract. The warranty provision (Section 16003,2.7) required Metric to "[l]eave entire electrical system in proper working order." The Board reasoned that this provision would already require the replacement of broken lamps before project completion. Second, the Board placed "great weight" on the six-month period from October 1993 to April 1994 during which the parties negotiated the amount of the credit due NASA for the work deleted by Modification 1345. The Board found it significant that Meisner did not assert that NASA was due no money until the negotiations between the parties failed.

Metric appeals the Board's decision. Metric relies, as it did before the Board, on evidence that trade practice and custom in the industry show that it was only to replace broken or defective lamps prior to project completion, not relamp the facility, and that the conduct of the parties shows that both parties acted in conformity with this interpretation of the contract.

As to trade usage and custom, Metric points out, and the Board found, that the term "relamping" is commonly used in the electrical industry to mean the total replacement of lamps at a particular facility. The Board also found that it is uncommon for specifications for new construction to require relamping. Evidence showing that neither Meisner's project manager nor its president had ever seen a requirement to relamp a newly constructed facility in forty-five years of combined experience underlies that finding. The Board further found that, during construction of the SSPF, Meisner received an unrelated subcontract to perform electrical work on the Kennedy Space Center Transportation Canister Facility. That contract contained a specification identical to Section 16511 of the SSPF contract, but NASA did not require Meisner to relamp the facility, nor did it issue a contract modification deleting a relamping requirement from that contract. Instead, Meisner replaced only broken or burned out lamps before project completion.

Metric also points this court to other findings of the Board supporting the reasonableness of its interpretation. Metric notes, for example, that Meisner's bid for the electrical work included labor to install only one set of lamps. Moreover, when Meisner presented the specifications to four prospective lamp suppliers for competitive bids, none submitted bids for a second set of lamps.

Metric contends that NASA's conduct, too, supports its interpretation of the contract. NASA selected Jacobs Engineering Group, Inc. to prepare the contract specifications and an estimate of the costs of constructing the SSPF. Jacobs' estimate did not include relamping the facility. In addition, NASA issued numerous unilateral change orders during the project affecting the number of lamps, but at no time sought a credit for a second set of lamps or required Metric to price a second set of lamps. Finally, the contract required Metric to prepare and maintain a detailed schedule of performance activities based on the critical path method (CPM). The CPM schedule did not include relamping as an activity. NASA reviewed and approved Metric's CPM schedule. NASA responds that these were "mere oversights."

Finally, Metric points out that the vast majority of lamps for this project (nearly 12,000 of about 13,000) had a life of six years and eight months. The Board found that most of the lamp installation occurred during the summer of 1993. Metric delivered more than half of the facility in June and October 1993, and ultimately completed the project the following summer. Based on this sequence of events, Metric points to the absurdity and waste of relamping recently installed, long-lived lamps.

For its part, NASA relies primarily on the language of the contract itself, which it contends unambiguously requires relamping. NASA also relies on the additional grounds identified by the Board, namely, that Metric's interpretation of the specifications would render them meaningless in view of the warranty provision, and that Metric participated in negotiations with NASA for six months before definitively taking the position that the original contract did not require relamping.

## II.

■ This court reviews contract interpretation without deference. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996). This court will accept any underlying findings of the Board, however, unless they are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or ... not supported by substantial evidence." 41 U.S.C. § 609(b) (1994).

## III.

■ When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity. *See Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. *See Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993). Rather, both interpretations must fall within a "zone of reasonableness." *See WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 876 (1963). If this court interprets the contract and detects an ambiguity, it next determines whether that ambiguity is patent. *See Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649–50 (1982). The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem* which construes an ambiguity against the drafter, here, NASA. *See id.; Sturm v. United States,* 190 Ct.Cl. 691, 421 F.2d 723 (1970). An ambiguity is patent if "so glaring as to raise a duty to inquire[.]" *Newsom,* 676 F.2d at 650. If an ambiguity is not patent but latent, this court enforces the general rule. *See Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988).

This case squarely presents the recurring issue of the role of evidence of trade practice and custom in contract interpretation. The case law identifies two seemingly divergent roles for such evidence. One line of cases holds that this court may consult evidence of trade practice and custom to discern the meaning of an ambiguous contract provision, but not to contradict or override an unambiguous contract provision. In *R.B. Wright Construction Co. v. United States,* 919 F.2d 1569 (Fed.Cir.1990), for example, the contract required the contractor to apply three coats of paint to specified surfaces. The contractor applied three coats of paint to previously unpainted surfaces and, in accordance with industry practice, applied only two coats of paint to previously painted surfaces. This court interpreted the contract to unambiguously require three coats of paint on all surfaces, regardless of industry practice: "Neither a contractor's belief nor contrary customary practice ... can make an unambiguous contract provision ambiguous, or justify a departure from its terms." *Id.* at 1572; *see also WRB Corp. v. United States,* 183 Ct.Cl. 409 (1968) (finding that a trade practice of using masonite doors on paint-grade cabinets does not overcome an unambiguous contract provision requiring wood doors on paint-grade cabinets); *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 564 F.2d 939, 945 (1977) ("A trade practice cannot prevail over unambiguous provisions of a contract....").

The second line of cases holds that this court may consult evidence of trade practice and custom to show that "language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning." *Gholson, Byars, and Holmes Constr. Co. v. United States,* 173 Ct.Cl. 374, 351 F.2d 987, 999 (1965). In *Gholson,* this court's predecessor considered the meaning of a contract term requiring "painting of all previously painted or varnished surfaces." The contractor contended that a baked enamel surface, although admittedly a "previously painted surface," was not regarded as such in the industry. The Board declined to consider the evidence of trade practice because the contract language was clear on its face. On appeal, the United States Court of Claims reversed: "[T]he principle is now established in this court (and almost every other court) that in order that the intention of the parties may prevail, the language of a contract is to be given effect according to its trade meaning notwithstanding that in its ordinary meaning it is unambiguous." *Id.; see also W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 376 F.2d 299, 311 (1967) (finding legal error

where the Board failed to consider trade practice and custom because of its holding that the contract was unambiguous).

These two lines of cases, however, only seem to diverge. In practice, they are both consistent with contract interpretation doctrines and practices. The United States Court of Federal Claims recognized those unifying principles in *Western States Construction Co. v. United States*, 26 Cl.Ct. 818 (1992). In that case, the trial court considered the meaning of a contract term requiring wrapping of underground "metallic pipe" with protective tape. The contractor introduced evidence showing that, in the industry, "cast iron soil pipe," although technically "metallic pipe," was not wrapped with protective tape. The Court of Federal Claims, aptly reconciling the two seemingly conflicting lines of cases of this court and its predecessor, consulted trade practice and custom to determine whether wrapping of cast iron soil pipe was consistent with the contract and thus whether an ambiguity arose at all. *See id.* at 826. This *Western States* analysis correctly applies the law of contract interpretation.

■ This court adheres to the principle that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). Thus, to interpret disputed contract terms, "the context and intention [of the contracting parties] are more meaningful than the dictionary definition." *Rice v. United States*, 192 Ct.Cl. 903, 428 F.2d 1311, 1314 (1970); *see also Western States*, 26 Cl.Ct. at 825; *Corman v. United States*, 26 Cl.Ct. 1011, 1015 (1992). Trade practice and custom illuminate the context for the parties' contract negotiations and agreements. Before an interpreting court can conclusively declare a contract ambiguous or unambiguous, it must consult the context in which the parties exchanged promises. Excluding evidence of trade practice and custom because the contract terms are "unambiguous" on their face ignores the reality of the context in which the parties contracted. That context may well reveal that the terms of the contract are not, and never were, clear on their face. On the other hand, that context may well reveal that contract terms are, and have consistently been, unambiguous.

Thus, evidence of trade practice and custom plays an important role in contract interpretation. Before arriving at a legal reading of a contract provision, a court must consider the context and intentions of the parties. That context may or may not disclose ambiguities. In any event, evidence of trade practice and custom is part of the initial assessment of contract meaning. It illuminates the contemporaneous circumstances of the time of contracting, giving life to the intentions of the parties. It helps pinpoint the bargain the parties struck and the reasonableness of their subsequent interpretations of that bargain.

■ This role for evidence of trade usage, however, does not mean that a court should always accept evidence of trade practice and custom in interpreting the terms of a contract. A contracting party cannot, for example, invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting. Trade practice evidence is not an avenue for a party to avoid its contractual obligations by later invoking a conflicting trade practice. *R.B. Wright* and similarly decided cases stand for this important proposition of contract interpretation law.

Instead, a court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract. Without such a showing, evidence that some practitioners customarily accomplish tasks differently from the manner called for by the contract will not overcome the clear language of the contract. This requirement helps ensure that the evidence of trade practice and custom truly reflects the intent of the contracting party, and avoids according undue weight to that party's purely *post hoc* explanations of its conduct.

The *Gholson* rule and these principles of contract interpretation find general support in authoritative legal commentaries. The commentaries agree that courts should use evidence of trade practice and custom not only to determine the meaning of an ambiguous provision, but to determine whether a contract provision is ambiguous in the first instance. *See, e.g.,* Restatement (Second) of Contracts § 220 cmt. d (1981) ("[U]sage relevant to interpretation is treated as part of the context of an agreement in determining whether there is ambiguity or contradiction...."); 3 Arthur L. Corbin, Corbin on Contracts § 555 at 232–39 (1960) ("Seldom should the court hold that the written words exclude evidence of the custom, since even what are often called 'plain' meanings are shown to be incorrect when all the circumstances of the transaction are known; and usages and customs are a part of those circumstances by which the meaning of words is to be judged."); 5 Samuel Williston, Williston on Contracts § 648 at 6–7 (3d ed. 1961) ("Usage is an ordinary means of proving the local or technical meaning of language, and even language which is normally clear and unambiguous may be shown by usage to bear, under the circumstances of the case, a meaning different from its normal sense.").

■ Of course, even when accepted, evidence of trade practice and custom does not trump other canons of contract interpretation, but rather cooperates with them. Courts prefer, for example, an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless. *See United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983). Thus, a court should consider whether adopting the interpretation advanced by the party relying on trade practice and custom would deprive the specification at issue of all meaning, or if there is a more limited sense in which the requirement still applies. Where canons of contract interpretation point to different interpretations, resolution of the conflict is necessarily left to the facts of the particular case.

■ Armed with these principles, this court examines anew whether the contract specifications at issue here are ambiguous, and finds that they are. Metric introduced sufficient evidence of trade practice and custom, and reasonable reliance on that trade practice and custom, to show that the specifications are susceptible to two different reasonable interpretations. The evidence shows that the electrical industry commonly uses the term "relamping" to mean the total replacement of lamps at a particular facility. Not only does that term not appear in the contract, relamping is rarely performed in connection with a newly constructed facility. This evidence is buttressed by NASA's interpretation of the Canister facility contract which contained identical language to Section 16511 of the SSPF contract, but which neither party interpreted as requiring relamping. Metric's reliance on its interpretation is reflected in its bid, which included labor to install only one set of lamps and the cost of only one set of lamps.

In contrast to the Board and NASA, this court does not believe that adopting Metric's construction of the contract to require replacement of only broken and defective lamps before project completion deprives those specifications of all meaning in view of the contract's warranty provision. The warranty provision only required Metric to leave the "electrical system" in proper working order. It did not hold Metric accountable for everything plugged into the electrical system, such as lamps, in addition to the electrical system itself. In other words, properly interpreted, the warranty provision only required Metric to leave the electrical infrastructure in proper working order. Thus, that provision did not render Metric's interpretation of the specifications at issue meaningless, but rather left them with a more limited sense in which they still applied. That is, the contract required replacement of defective, burned out, or broken lamps immediately before project completion.

This court also does not consider the Board's alternative ground—the six-month period of negotiations between the parties—to show that Metric's claim interpretation is unreasonable. Many factors influence negotiations, not the least of which is the desire to avoid costly litigation. In light of this fact and the substantial other evidence discussed

above, this single factor cannot support the conclusion that the meaning NASA and the Board ascribe to the contract is the only reasonable one. Therefore, this court detects an ambiguity in the contract.

Finally, this court does not perceive the ambiguity as "so glaring as to raise a duty to inquire[.]" *Newsom*, 676 F.2d at 650. Because this contract contains a latent ambiguity, this court construes that ambiguity against the drafter, NASA. Accordingly, this court reverses the decision of the Board on contract interpretation, rendering moot the issue of the quantum of NASA's equitable adjustment.

*REVERSED.*