# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Family Entertainment Services, Inc. | ) ASBCA No. 61157 |
| | ) |
| Under Contract No. W91248-15-D-0008 | ) |

APPEARANCE FOR THE APPELLANT:       Mr. William Johnson
                                    President

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
                                     Army Chief Trial Attorney
                                    MAJ Bruce L. Mayeaux, JA
                                     Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE OSTERHOUT

This appeal challenges deductions in the amount of $81,692.34 by the Army on a grounds maintenance contract for 3,897 acres at Fort Campbell, Kentucky, and the Fort Campbell cantonment area which was geographically located in Tennessee. Family Entertainment Services, Inc.[1] claims that the government improperly reduced the amount it paid based on two arguments: 1) the period of performance should have been measured in work days but was instead measured in calendar days; and 2) the government improperly applied the terms of the contract relating to inspections under technical exhibit one of the contract and deducted the wrong amount. The Army responds that the term "day" means calendar day unless otherwise specified and explained the reasons for the deductions from the contract.[2] For the reasons set forth below, we deny the appeal.

---

[1] This appeal was docketed as Family Entertainment Services, Inc. D/B/A IMC, however, the contract was issued to Family Entertainment Services, Inc., and for purposes of this decision we refer to appellant as Family Entertainment Services, Inc. or FES.

[2] In its brief, the government also addresses what it interprets as appellant's constructive acceleration argument. Because FES did not brief this argument, it is deemed abandoned. *See States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,664 (failure to address claimed contentions in brief equated to abandonment of the issue).

## SUMMARY FINDINGS OF FACT

1. On 26 May 2015, the Mission and Installation Contracting Command—Fort Campbell (the government), awarded Contract No. W91248-15-D-0008 (the contract), a firm-fixed price contract to provide grounds maintenance services on Fort Campbell, Kentucky, to Family Entertainment Services, Inc. (appellant or FES) (R4, tab 1).

2. The contract incorporates Federal Acquisition Regulation (FAR) 52.212-4 by reference (R4, tab 1 at 1, block 27b). FAR 52.212-4(e) incorporates FAR 52.202-1, DEFINITIONS (NOV 2013). FAR 52.202-1 states:

> (a) When a solicitation provision or contract clause uses a word or term that is defined in the Federal Acquisition Regulation (FAR), the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued, unless—
> (1) The solicitation, or amended solicitation, provides a different definition;
> (2) The contracting parties agree to a different definition....

3. FAR 2.101, both currently and at the time of solicitation and award states, "*Day* means, unless otherwise specified, a calendar day."

4. The contract also specifically references days in paragraph 5.3.1 of the Performance Work Statement (PWS) where the government outlines the scope of work for the mowing and ground maintenance contract. For Schedule B, the following is included in the contract:

> **5.3.1.1 Level II, Kentucky Normal Visibility Areas (*CLIN x002AA, x002AB*). Mowing**:
> Approximately 1,118 acres of grass to be cut between 2" to 4" height. Estimated once every 21 days. As a possible option, the contractor shall mow at least once every 14 days. The government retains the option to award the contract for mowing the same 1,159 acres on a 14 day cycle, depending on availability of funds.[3]

> ....

---

[3] The differing number of acres is in the original and is unexplained.

**5.3.1.3 Level III Airfield & trimming around runway lights. (*CLIN x002AC*). Mowing:**
Cut approximately 887 **acres** at 6", plus an area 12' in diameter (6' radius) shall be cut around all taxiway lighting at 3" height. Locations as indicated on maps. *Airfield to be mowed every 14 days*[.]

**5.3.1.4 Level IV Landfills and Similar (CLIN x002AD).**
Mow approximately **56** acres of landfills to a grass height of 6" as indicated on the maps. *Contractor has 10 days to perform this task*[.]

(R4, tab 1 at 41 (emphasis added to demonstrate red text in the contract)) Edging and debris removal was "to be conducted concurrent with the Levels II and III mowing cycles" (R4, tab 1 at 41-42, ¶¶ 5.3.1.1.1, 5.3.1.1.2, 5.3.1.5.1, 5.3.1.5.2). Schedule C contained the same language, with different acre amounts, throughout the contract. The contract also contained numerous paragraphs which all reference numbers of days the contractor is permitted to complete certain tasks. None of these paragraphs otherwise specified the word "day." (R4, tab 1 at 41-51)

5. The contract referenced days in several places: block 12 of the Standard Form 1449 ("Net 30 Days") (R4, tab 1 at 1); "7 calendar days" in paragraph (b)(3) of the order limitations clause (*id.* at 16); "5 days after issuance" in paragraph (d) of the order limitations clause *id.* at 17); "30 days" in the option to extend services clause (*id.* at 18); "30 days" and "60 days" in the option to extend the term of the contract clause (*id.* at 18); "35 calendar days" in the AMC-level protest program clause (*id.* at 21); "5 working days" in the DoD Antiterrorism Standards clause (*id.* at 23); "30 days" in the schedule of insurance (*id.* at 26); "71 days" and "79 days" regarding weather (*id.* at 28); "ten days" and "five (5) days" regarding quality control plans (*id.* at 29); "five (5) work days" regarding contractor discrepancy reports (*id.* at 29); "ten (10) work days," "30 work days" regarding key personnel changes (*id.* at 32); "30 calendar days" to provide a safety plan (*id.* at 39).

6. The contract contained a section on hours of operation. Specifically, paragraph 1.6.4.2 defined the contractor working hours as follows:

> The Contractor shall be responsible for providing services, between the hours of 7:30 A.M. to 4:30 P.M., Monday through Friday, except federal holidays or when the government facility is closed due to local or national emergencies, administrative closings or similar government directed facility closings. The Contractor may work outside of the hours at no additional cost to the Government if approved 48 hours in advance by the COR. The contractor

3

shall inform the Government of the location he plans to work
for any work performed outside of normal working hours.

(R4, tab 1 at 30)

7. The contract incorporated FAR 52.246-4, INSPECTION OF SERVICES–FIXED-PRICE (AUG 1996), which discusses what happens if the services do not conform with contract requirements in subparagraph e:

> (e) If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

(R4, tab 1 at 24)

8. The contract included Technical Exhibit 1, which outlined performance requirements, as follows:

| Performance Objective | Performance Standard | Performance Threshold/ AQL | Method of Surveillance | Remedy |
|---|---|---|---|---|
| Contractor shall comply with Grass cutting and weeding | IAW PWS 3.3.1.1 and 3.3.1.2 | 95% | Random | Rework within 24 hours or CDR may be issued for not meeting AQL[4] |
| Contractor shall comply with Raking Leaves and grass | IAW PWS 3.3.5.1.8 | 95% | Random | Rework within 24 hours or CDR may be issued for not meeting AQL |

---

[4] CDR = Contractor Discrepancy Report.
AQL = Acceptance Quality Level.

4

| Contractor shall keep drainage and asphalt areas free of debris at all times | IAW PWS 5.8 | 95% | Random | Rework within 2 hours or CDR may be issued for not meeting AQL |
|---|---|---|---|---|

(R4, tab 1 at 59)

9. The contract included Technical Exhibit 8, a sample inspection worksheet. It included performance criteria of mowing the area, edging, trimming, debris removal, and repairing damaged areas with pass or fail as possible ratings, as well as an overall pass or fail rating. (R4, tab 1 at 83)

10. On 29 May 2015, the government awarded Task Order No. 0001 to FES (the task order). The task order included Schedule B and Schedule C. Schedule B included KY Level II, KY Level III, and KY Level IV. Schedule C included TN Level II, TN Level III, and TN Level IV. The requirements were described in the following charts:

PRICE SCHEDULE

| SUPPLIES/SERVICES | ESTIMATED QUANTITY | UNIT | ESTIMATED CYCLES PER YEAR | ITEM NO | UNIT PRICE BASE YEAR | PER-CYCLE COST | BASE PERIOD PRICE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| LINE ITEM 0002 - SCHEDULE B BASE PERIOD | | | | | | | |
| KY Level II - cut between 2" and 4" height (includes all vegetation trimming IAW PWS). Every 14 days. | 1118 | Acres | 15 | 0002AB | $35.00 | $39,130.00 | $586,950.00 |
| KY Level III (Airfield & Trimming around Runway Lights) - cut at 6", plus an area 12' in diameter (6' radius) shall be cut around all taxiway lighting at 3" height. (IAW PWS). Locations: As indicated on maps. | 887 | Acres | 15 | 0002AC | $20.65 | $18,316.55 | $274,748.25 |
| KY Level IV (Landfills & Similar) - cut to 6" height where indicated on maps. | 55 | Acres | 2 | 0002AD | $32.00 | $1,760.00 | $3,520.00 |
| | | | | | | Total | $865,218.25 |

| SUPPLIES/SERVICES | ESTIMATED QUANTITY | UNIT | ESTIMATED CYCLES PER YEAR | ITEM NO | UNIT PRICE BASE YEAR | PER-CYCLE COST | BASE PERIOD PRICE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **LINE ITEM 0003 - SCHEDULE C** | **BASE PERIOD** | | | | | | |
| TN Level II - cut between 2" and 4" height (includes all vegetation trimming IAW PWS). **Every 14 days.** | **1435** | Acres | 15 | 0003AB | $34.93 | $50,124.55 | $751,868.25 |
| TN Level III (Airfield & Trimming around Runway Lights) - cut at 6", plus an area 12' in diameter (6' radius) shall be cut around all taxiway lighting at 3" height. (IAW PWS). Locations: As indicated on maps. | **286** | Acres | 15 | 0003AC | $22.75 | $6,506.50 | $97,597.50 |
| TN Level IV (Landfills & Similar) - cut to 6" height where indicated on maps. | **116** | Acres | 2 | 0003AD | $32.00 | $3,712.00 | $7,424.00 |
| | | | | | | **Total** | **$856,889.75** |

(R4, tab 2 at 5-6)

11. In the original contract, Level II services were estimated at every 21 days but the government retained the option to mow at least once every 14 days (R4, tab 1 at 41, 43; finding 4). In the task order, both Schedule B and Schedule C specified that the Level II mowing services would be completed every 14 days and provided an estimated cycles per year amount of 15 cycles (R4, tab 2 at 5-6).

12. On 1 June 2015, the parties held a post-award conference. During the conference, the parties discussed how FES could work on weekends, specifically the requirement that it had to be coordinated with the contracting officer's representative. FES was reminded that the first cycle would begin on 22 June 2015. FES was further advised that only William Johnson could sign change orders for FES. (R4, tab 3)

13. On 6 July 2015, the contracting officer (CO), Jennifer Davis, sent an electronic mail message to the contracting specialist, SFC Carlet Clark, concerning FES being behind schedule. SFC Clark forwarded the message to Mr. Johnson. (R4, tab 4)

14. On 7 July 2015, the parties held another meeting to discuss the status of the contract and the CO informed Mr. Johnson that he was behind schedule for the 14 calendar day schedule. For the first time, Mr. Johnson raised concerns that the

6

period of performance was actually work days not calendar days. Mr. Johnson stated that he was willing to mow on a 14 calendar day cycle. The parties also agreed that Tennessee and Kentucky locations were supposed to be mowed concurrently. The CO clarified that the contractor could work outside of the 0730 to 1630 Monday through Friday hours if it was approved 48 hours before the work would begin. The government also informed Mr. Johnson that it was still missing information, such as contact information, schedules detailing where and when mowing would occur, and daily reports. During the meeting, Mr. Johnson informed the government of when he would begin and complete each cycle and the government modified the periods of performance or set the schedules based on his assertions. (R4, tab 5)

15. We find that using a "calendar day" calculation, the period of performance for Cycle 1 was 22 June 2015 through 5 July 2015; Cycle 2 was 6 July 2015 through 19 July 2015; and Cycle 3 was 20 July 2015 through 2 August 2015. By FES's interpretation, the period of performance for Cycle 1 would not have ended until 9 July 2015. Using a "work day" calculation would add four additional days in each cycle to complete the work.

16. During the meeting referenced in finding 14 and several other meetings between 7 July 2015 and 14 July 2015, the parties established a schedule that Mr. Johnson agreed he could meet. He still failed to meet the schedule and the parties met to reset the schedule again. The parties again discussed the need for FES to submit daily reports so inspections could be accomplished. (*See* R4, tab 5 at 10-11, tabs 6, 9)

17. In total, the government allowed FES four additional days for Cycle 1, nine additional days for Cycle 2, and five additional days for Cycle 3.

18. The deficiencies and detailed schedules were reduced to writing by both parties. The CO again informed Mr. Johnson via electronic mail that he was required to request approval to work outside of the hours 0730-1630 Monday through Friday. (R4, tab 8)

19. The government used the inspection worksheet included as an exhibit in the contract to notify FES of deficiencies on several occasions, and to specifically detail work that had not been completed (*see* R4, tabs 12, 14-15, 17, 23-27, 30-31, 35-37, 40-41).

20. On 24 July 2015, the parties again met to discuss the incomplete mowing and the problem with FES not submitting the daily reports so that the contracting officer's representative could conduct inspections (supp. R4, tab 46).

21. On 10 August 2015, the CO issued a cure notice (gov't br. at 12; supp. R4, tab 47 at 3). Also on 10 August 2015, the CO informed Mr. Johnson that the daily reports he started submitting in August were confusing and inaccurate (R4, tab 32).

7

22. On 19 August 2015, Mr. Johnson responded to the cure notice. He again reiterated that he had tried to perform within 14 calendar days but found that FES was still encountering problems meeting the schedule. He "acknowledge[d] that the schedules were initially lacking in detail on planned work and were unclear as to completed work" but stated that FES should not be penalized if the work was 95% complete. Mr. Johnson included a list of ways FES would correct the deficiencies going forward, which was similar to the previous times he had submitted solutions to correct deficiencies. (R4, tab 47)

23. On multiple occasions, Mr. Johnson stated that he agreed with deducting money for work that was not performed but disagreed with the amounts (*see, e.g.*, R4, tab 42 at 2 ("We concur with a monetary deduction being taken for areas that were not mowed, but do not concur or agree with the current dollar amount reflected.")). In most instances, FES agreed with the government's assessment of what services were not completed (R4, tab 16; supp. R4, tab 47).

24. Based on all of the discrepancies, all of which were provided to FES, the government determined that FES was responsible for maintaining 3,897 acres in Cycle 1 but only completed 3,088.6 acres, which resulted in 79.3% of the work being accomplished. For Cycle 2, the government determined that FES was responsible to maintain 3,897 acres but only accomplished 2,792 acres, for a total of 71.7% accomplished. For Cycle 3, the government determined that FES was responsible to maintain 3,897 acres but only accomplished 2,636.1 acres for a total of 67.6% accomplished. For each area and cycle, the government provided a more detailed breakdown to properly charge the deductions, based on the number of acres not performed in each cycle, each schedule, each service, and each level to be performed, which matched the way the pricing was set forth in the contract. (*See* gov't br., attach. at 5-6, 9-11)

25. On 28 August 2015, the government terminated Schedule B from the contract for convenience (R4, tab 44).

26. On 10 January 2017, FES filed a claim with the government in the amount of $81,692.34 alleging: 1) in "Issue One" that the days were not computed properly because they should have been work days rather than calendar days; and 2) in "CLAIM ONE" that too much was deducted for incomplete work (Bd. corr., notice of appeal (NOA) at 5, 7).

27. On 1 May 2017, having not received a CO's final decision, FES filed this appeal from the deemed denial of the claim, which was docketed as ASBCA No. 61157 (NOA at 3).

28. On 24 May 2017, the CO subsequently issued a final decision denying the claim in its entirety (supp. R4, tab 49).

## DISCUSSION

Appellant raises two specific issues. First, FES requests that the Board define the term "day" in the contract as "work day" instead of "calendar day." Second, FES requests the Board find that the government improperly inspected the areas where service was provided and, hence, deducted too much from the contract. While the claim submitted to the CO focuses more on the definition of "day" than any other argument, FES did briefly raise issues surrounding inspections and deductions; thus, we may decide that issue. In contrast, FES did not include claims for weather delays in its submission to the CO so we may not decide that issue.

*I. The Definition of Day*

Appellant asks the Board to find an ambiguity in the contract and to read the term "day" as "work day" instead of "calendar day." The Court of Appeals for the Federal Circuit has provided us with guidance regarding ambiguities in a contract:

> "In resolving disputes involving contract interpretation, we begin by examining the plain language of the contract." *M.A. Mortenson* [*Co. v. Brownlee*], 363 F.3d [1203,] 1206 [(Fed. Cir. 2004)]; *see also Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). We construe a contract "to effectuate its sprit and purpose giving reasonable meaning to all parts of the contract." *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002). The threshold question here is whether the plain language of the contract "supports only one reading or supports more than one reading and is ambiguous," *NVT Techs.* [*Inc. v. United States*], 370 F.3d [1153,] 1159 [(Fed. Cir. 2004], as held by the Board. Ambiguity exists when contract language can reasonably be interpreted in more than one way. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999).

*LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009). Parties having a differing opinion of contract terms is not enough to show ambiguity. *See Metric Constructors*, 169 F.3d at 751 (citations omitted). "Rather, both interpretations must fall within a 'zone of reasonableness.'" *Id.* (citations omitted).

Here, there is only one reasonable way to interpret the contract. Appellant's opinion that "day" should mean "work day" is not a reasonable interpretation of the

9

contract. The contract clearly incorporates FAR 52.212-4, which then incorporates FAR 2.101 definitions. (Finding 2)

FAR 2.101 defines "day" as "unless otherwise specified, a calendar day." This definition is incorporated by reference into the subject contract. (Finding 3) The places in the solicitation where FES would like to apply the specific term "work days" only contain the simple word "day" without any specificity. Thus, the days in question are calendar days, not work days.

FES argues that paragraphs 2.1.15 and 2.1.21 of the performance work statement replaced the FAR 52.202-1 definition of "day" because the performance work statement defines "work day" and "work week." FES's argument is that because it was limited to a certain number of hours to work during the week that specificity should be read into the term "day" to instead include the word "work" in front of the word "day" (app. br. at 7). However, the definition of "work day" does not extend to the term "day" but instead only applies to the specific term "work day." Additionally, FES was not limited to working only during the hours stated in the contract. Instead, FES was required to give the government written notice and obtain permission 48 hours before working outside of the normal duty day. (*See* finding 6) If FES wanted to work outside of the defined government hours, the government had to arrange for a government employee to be available to inspect the work, hence the need for 48 hours of notice. The parties discussed this process on several occasions. (Findings 12, 14, 18; *see also* R4, tab 9 at 2, ¶ 11 (meeting minutes))

Additionally, even if we ignored the FAR definition and accepted appellant's opinion and decided that "day" meant "work day" then that definition would need to be applied throughout the entire contract where the term "day" existed, which would create issues with other clauses. For example, 30 days for payment would not make sense if defined as work days, nor would 30 days and 60 days for notice for the options to extend the contract. (*See* finding 5)

Further, and perhaps most compelling, even if we agreed with appellant concerning the application of his definition, the government granted FES more time via extensions than it would have been allowed even if "work days" had been applied instead of "calendar days." On several occasions, the government extended the period of performance for each of the cycles, generally based on when Mr. Johnson stated FES would be able to complete the work. Based on Mr. Johnson's statements referenced in the 7 July 2015 meeting regarding when he could complete and start cycles, it appears that Mr. Johnson believed the Schedule B and Schedule C cycles could run concurrently (finding 14). If we applied "work days" instead of calendar days, FES would have had four additional days to complete each cycle. The government granted FES extensions of at least four days in every cycle (finding 17). Still, FES failed to complete all of the work on time.

Finally, in its brief, appellant raises for the first time that FES should have been granted more extensions due to weather and this failure to grant additional extensions was one of the reasons FES did not complete the work in the required period of performance (app. br. at 9-11 and attach.). This is a separate argument that is not precisely related to the definition of "days" as either "work" or "calendar" and is instead a new claim that has not yet been presented to the CO. In fact, in its claim, FES explicitly stated, "No Claim is being made for areas FES previously identified as not being mowed due to having to re-mow areas, *weather*, and government impact of performance" (NOA at 7-8; compl. at 5-6 (emphasis added)). However, in its brief FES argues that it was not granted sufficient time for weather (app. br. at 9-11, attach.). We need not consider this argument because FES did not raise this issue as the basis of the claim to the CO. The CO did not have adequate notice of weather as a basis for this claim. Accordingly, we lack jurisdiction to consider this argument. *See, e.g., Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) (citations omitted) (The requirement for a claim "is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and the amount of the claim.").

## II. Inspections and Deductions

As its second basis for entitlement, FES disputes the way inspections occurred and the amount of deductions for nonperformance of work due to exhibit 1 in the contract which refers to a performance threshold of 95% (app. br. at 11-12). The issue FES would like us to resolve is whether the inspections and deductions were proper pursuant to the contract. Upon review of the record, FES largely agreed with the deficiencies and agreed that some amount should be deducted, but disagreed with the amount of deductions (finding 23).

Contract performance was an issue from the beginning of this contract, as demonstrated in the first issue concerning "days" above. From as early as 14 July 2015, Mr. Johnson agreed that FES should not be paid for work that was not performed (R4, tab 9 at 1, ¶ 9). The government tracked what work FES performed by conducting inspections.

FES was on notice that inspections would occur because of several clauses in and exhibits to the contract. The contract contained the Inspection of Services clause (finding 7), specific performance requirements (finding 8), and a sample inspection worksheet to demonstrate what would be inspected (finding 9). Thus, the contractor was sufficiently on notice concerning how its work would be inspected.

Appellant points to some errors in Technical Exhibit 1 as proof that the inspections were not permitted by the contract. Appellant is correct that Technical

11

Exhibit 1 references the wrong paragraphs in the performance work statement (app. br. at 12); however, it is clear that these inaccurate paragraph numbers were administrative errors. Further, the rest of the contract demonstrates that inspections would be for mowing, edging, and the other services in the contract. Even the rest of Technical Exhibit 1 demonstrates that inspections would be conducted for grass cutting and weeding, raking leaves and grass, and keeping drainage and asphalt areas free of debris (finding 8). Further, Technical Exhibit 8 demonstrates what work would be inspected.

The government repeatedly informed Mr. Johnson and FES that there were deficiencies with the services being provided (finding 19). In order to insure inspections were properly conducted, the government repeatedly requested daily reports to accurately describe what areas were mowed (*see* findings 14, 16, 20). Even after FES started sending daily reports in August, which was after the first cycles should have been completed, the reports were inaccurate (finding 21). For example, three reports stated that "North Sod" was completed on three separate days but it was not actually completed until after the date of the last daily report (R4, tab 32 at 1).

Even without having daily reports that would allow the government to inspect what FES stated it had completed, the record demonstrates that the government inspected the properties and services. On several occasions, the government provided Mr. Johnson with maps where services had not occurred and detailed explanations of the missing services (*see* R4, tabs 7, 39). Further, the government used the inspection worksheets provided as an exhibit to the contract to document the problems with performance (*see* finding 19). The government also used Contract Discrepancy Reports, DD Form 2772, to document discrepancies in multiple pages of attachments (finding 9). Mr. Johnson seemed to generally agree with the government's assessment of the missing services, but disputed the amount the government proposed to deduct (finding 23).

The government documented each time FES did not complete the services, without the benefit of having FES's required daily reports (finding 19). Then, the government determined the number of acres that had not been completed and multiplied that number by the dollar amount for that service as provided in FES's proposal. Finally, the government deducted the resulting amount.

Based on all of the discrepancies, all of which were provided to FES, the government determined that FES was responsible for maintaining 3,897 acres in Cycle 1 but only completed 3,088.6 acres, which resulted in 79.3% of the work being accomplished. For Cycle 2, the government determined that FES was responsible to maintain 3,897 acres but only accomplished 2,792 acres, for a total of 71.7% accomplished. For Cycle 3, the government determined that FES was responsible to maintain 3,897 acres but only accomplished 2,636.1 acres for a total of 67.6% accomplished. For each area and cycle, the government provided a more detailed breakdown to properly charge the deductions, based on the number of acres not performed

in each cycle, each schedule, each service, and each level to be performed, which matched the way the pricing was set forth in the contract. (Finding 24)

The government was actually very generous to FES by limiting the amount of deductions. The government did not deduct money for FES's failure to submit daily reports and other written deliverables required by the contract (gov't br., attach. at 12). The government did not deduct the amount associated with additional hours it spent to administer the contract based on meeting multiple times for the same discrepancies or the time government employees spent performing grounds maintenance. The government allowed multiple extensions and changed the period of performance based on when Mr. Johnson asserted that FES could complete performance (finding 14). And the government provided multiple deficiency reports that clearly notified FES of what aspects of the contract were not being met (finding 19). Yet, FES still failed to meet the requirements of the contract. Accordingly, we hold that at no time did the government abuse its right, pursuant to the contract, to inspect the work performed and deduct an appropriate amount for the work that was not performed.

## CONCLUSION

The appeal is denied.

Dated: 24 October 2017

HEIDI L. OSTERHOUT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

13

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61157, Appeal of Family Entertainment Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14