ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                          )
                                                     )
Vigor Works, LLC                                     )          ASBCA No. 62607
                                                     )
Under Contract No. H92222-11-D-0080                  )

APPEARANCES FOR THE APPELLANT:          Mark G. Jackson, Esq.
                                        Stowell B. Holcomb, Esq.
                                          Jackson Holcomb LLP
                                          Seattle, WA

APPEARANCES FOR THE GOVERNMENT:         Caryl A. Potter, III, Esq.
                                          Deputy Chief Trial Attorney
                                        Maj Danelle McGinnis, USAF
                                          Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE THRASHER

Vigor Works, LLC (Vigor or appellant) appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from a contracting officer's final decision (COFD) denying appellant's certified claim in the amount of $5,213,618. Vigor seeks excess costs incurred from what it describes as the government constructively changing the contract by accelerating the production pace and sequence through the issuance of delivery orders. The parties have elected a written disposition under Board Rule 11. We deny the appeal.

FINDINGS OF FACT

1. On September 28, 2011, the United States Special Operations Command (SOCOM or government) awarded Contract No. H92222-11-D-0080 (the contract) to Vigor Works, LLC[1] (R4, tab 9). The contract was for the design, development, and fabrication of Combatant Craft, Medium Mark 1 (CCM Mk 1) systems (compl. ¶ 7; R4, tab 9a at 4).

2. The contract was an indefinite-delivery, indefinite-quantity (IDIQ) contract with firm-fixed-price and cost reimbursable contract line items (CLINs) for a total period of performance of ten years, including option periods (R4, tab 9 at 3). Part I of the contract contained "THE SCHEDULE" (R4, tab 9 at 2).

---

[1] SOCOM awarded the contract to Oregon Iron Works, Inc. (OIW), but OIW later became Vigor Works, LLC (R4, tab 36 at 3; app. supp. R4, tab 25 at 3).

3.  The Schedule, Section B, Supplies or Services and Prices, divided the CLINs into four successive periods:

- Base Period (CLINs 0001-0008)

- If applicable, Test Article Refurbishment (CLINs 0009-0018)

- If applicable, Low Rate Initial Production (CLINs 0019-0044)

- If applicable, seven Production/Sustainment Ordering Periods (CLINs 1001-7027)

(R4, tab 9 at 3)  Each CLIN was to be "set forth under individual delivery order" and performed "in accordance with Sections C[2] and J" of the contract (*see* R4, tab 9 at 4-126).

4.  The Schedule, Section F, Deliveries or Performance, established delivery information for each CLIN, including delivery dates for CLINs 0001 to 7027 (R4, tab 9 at 1, 133-46).

5.  Part III of the contract contained "LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS" (R4, tab 9 at 1).  Section J listed the documents, exhibits, and other attachments.  The first item listed is Exhibit A, Contract Data Requirements Listings A, E, L, dated August 11, 2011.  (R4, tab 9 at 182; *see also* R4, tab 9k)  The contract required the contractor to provide several Contract Data Requirement Lists (CDRLs), including A006 Integrated Program Master Schedule (IPMS) (R4, tab 9 at 6).

6.  The Data Description for A006 IPMS provides:

1) The Contractor shall prepare, maintain, and update a CCM Mk 1 Integrated Program Master Schedule (IPMS) that reflects the Contractor's program and schedule planning.  The Contractor shall ensure the IPMS reflects the baseline schedule and all changes thereto and maintain the IPMS throughout the life of the contract.

---

[2] There is no "X" under Part I, Section C, Description/Specs/Work Statement.  The contract included the Statement of Work as Attachment 01 under Section J (*see* R4, tab 9 at 1, 182).

2) The IPMS shall contain the networked, detailed tasks necessary to ensure successful program execution. The IPMS is vertically traceable to the Contract Work Breakdown Structure (CWBS), and the Statement of Work (SOW). The IPMS shall be used to verify attainability of contract objectives, to evaluate progress toward meeting program objectives, and to integrate the program schedule activities with all related components.

3) The IPMS shall also include the accomplishments and criteria necessary for the delivery of the CCM Mk 1 TA in the first period; deliveries of the LRIP CCM Mk 1 Systems and FRP CCM Mk 1 Systems in the second period; and implementation and execution of the performance based logistics process in the second period.

(R4, tab 9k at 9)

7. Section J included the Statement of Work (SOW) as Attachment 01 (R4, tab 9 at 182; *see also* R4, tab 9a). Section 3.2, Program Schedule, of the SOW stated "[Vigor][3] shall depict and track the CCM Mk1 program schedule in an up-to-date Integrated Program Master Schedule (IPMS). [Vigor] shall maintain the IPMS for the duration of the contract." (R4, tab 9a at 5) Additionally, Section 7.3.2 of the SOW provided:

> [Vigor] shall prepare, maintain, and update a CCM Mk 1 IPMS that reflects [Vigor's] program and schedule planning. [Vigor] shall ensure the IPMS reflects the baseline schedule and all changes thereto and maintain the IPMS throughout the life of the contract. The IPMS shall also include the accomplishments and criteria necessary for the delivery of the CCM Mk 1 TA in Period One; deliveries of the LRIP CCM Mk 1 Systems and FRP CCM Mk 1 Systems in Period Two; and implementation and execution of the performance based logistics process in Period Two. [Vigor] shall ensure the IPMS is up to date and available at all Government meetings. [Vigor] shall

---

[3] The SOW refers to OIW, which we previously noted later became Vigor (*see* n.1).

submit the CCM Mk 1 IPMS as well as all updates for the
life of the contract in accordance with CDRL A00[6].[4]

(R4, tab 9a at 32)

8. Section J also included a version of Vigor's IPMS as Attachment 06 (R4, tab 9 at 182; *see also* R4, tab 9f).

9. Notably, the Solicitation provided that those offerors in the competitive range would each be awarded a contract for construction and delivery of a CCM Mk1 Test Article (TA); support for government testing of the TA; and submission of revised proposals, if requested by the government (R4, tab 1 at 183). After delivery of the TA and completion of the government's testing and assessment, the government would downselect to one contractor (R4, tab 1 at 142). After completing its TA evaluation, the government requested a Best and Final Offer (BAFO) from each offeror (app. br. at 6; gov't br. at 24). Vigor submitted its BAFO in late 2013 (compl. ¶ 59; R4, tab 179). Vigor's BAFO included an updated version of the IPMS (BAFO IPMS)[5] (R4, tab 179 at 132-34). Vigor's BAFO stated,

> [Vigor's] CCM Mk1 proposed IPMS reflects our program
> and schedule planning and the baseline schedule and all
> changes. [Vigor] will maintain the IPMS throughout the
> life of the contract. . . . [Vigor] will ensure the IPMS is up
> to date and available at all meetings. [Vigor] will update
> the IPMS throughout the life of the contract and submit it
> per CDRL A00[6].

(R4, tab 179 at 30)

10. In February 2014, the government awarded Vigor the final down select for the production contract for CCM Mk1 craft and refurbishment of the TA (R4, tab 21 at 533). Effective February 20, 2014, the parties bilaterally executed Modification No. P00010 (R4, tab 21). Modification No. P00010 exercised the options for Test Article Refurbishment (TAR), Low Rate Initial Production (LRIP), and the first Full Rate

---

[4] Section 7.3.2 inadvertently refers to CDRL A007. The government later administratively changed this reference from CDRL A007 to CDRL A006 (*see* R4, tab 14 at 83).

[5] Vigor's Rule 11 brief places significant emphasis on the version of the IPMS that was included with its BAFO. Therefore, for clarity, we refer to this version as the "BAFO IPMS."

Production (FRP) ordering period. It also included updated versions of various attachments in Section J to include Vigor's BAFO IPMS.[6] (R4, tab 21 at 1, 24)

11. Vigor subsequently provided several updated versions of the IPMS (*see generally* R4, tabs 121-26, 128-35, 137, 139-57, 159-67, 218-30).[7]

12. On March 19, 2014, the parties executed bilateral Modification No. P00011, which updated the dates associated with each potential ordering period under Section B (R4, tab 23 at 6).

13. The government issued individual delivery orders consistent with the ordering periods in the contract. The government issued seven delivery orders purchasing CCM Mk 1 systems, each of which established delivery dates:

- Delivery Order 0001: Ordered one TA system and set the period of performance as September 27, 2011 to September 26, 2012 (R4, tab 37 at 2, 6). Modification No. 08 added TAR, to be delivered August 20, 2014 (R4, tab 37i at 7, 9).

- Bilateral Delivery Order 0002: Ordered two LRIP systems, to be delivered March 27, 2015 and June 12, 2015 (R4, tab 38 at 4, 8).

- Delivery Order 0003: Ordered 2 LRIP systems, to be delivered August 18, 2015 (R4, tab 39 at 2, 5).

- Delivery Order 0004: Ordered 1 LRIP system, to be delivered November 16, 2015 (R4, tab 40 at 3, 6).

- Bilateral Delivery Order 0005: Ordered 8 FRP systems, to be delivered February 18, 2016, March 31, 2016, May 12, 2016, June 23, 2016, August 4, 2016, September 15, 2016, October 27, 2016, and December 8, 2016 (R4, tab 41 at 3, 6). Modification No. 01 added a ninth FRP system, to be delivered March 17, 2017 (R4, tab 41c at 1, 3).

---

[6] The government notes "there is no indication that the parties ever attached this BAFO IPMS version to Contract Modification No. P00010. Instead, as evidenced by the Government's official file copy of that Modification, it appears that a completely different schedule from [Vigor's] BAFO was inadvertently attached as Attachment 06 to IDIQ Contract Modification No. P00010." (Gov't br. at 88)

[7] The record also includes quite a few versions of the IPMS that predate Modification No. P00010 (*see* R4, tabs 204-17).

- Bilateral Delivery Order 0018: Ordered 3 FRP systems, to be delivered May 17, 2017, June 21, 2017, and July 26, 2017 (R4, tab 181 at 3, 5).

- Bilateral Delivery Order 0019: Ordered 1 FRP system, to be delivered August 30, 2017 (R4, tab 182 at 3, 5).

14. The parties subsequently executed several bilateral modifications extending the delivery dates on these delivery orders:

- Delivery Order 0001: Modification No. 12 (R4, tab 180).

- Delivery Order 0002: Modification Nos. 05, 07, and 08 (R4, tabs 38e, 38g, 38i).

- Delivery Order 0003: Modification Nos. 01 and 02 (R4, tabs 39b, 39d).

- Delivery Order 0004: Modification No. 02 (R4, tab 40f).

- Delivery Order 0005: Modification Nos. 02, 03, 04, and 05 (R4, tabs 41e, 41l, 41n, 41t).

- Delivery Order 0018: Modification Nos. 01, 02, and 03 (R4, tabs 183, 185, 188).

- Delivery Order 0019: Modification Nos. 01 and 02 (R4, tabs 184, 186).

15. On September 1, 2017, Vigor submitted a request for equitable adjustment (REA) seeking $4,148,629 for excess costs incurred and a reasonable profit on such costs. The REA alleged that the government made numerous changes in the production sequence and pace specified in the contract resulting in Vigor's excess costs. (R4, tab 168 at 1, 22-23) Vigor alleges five changes to the contract's production pace and three changes to the contract's production sequence:

- Production Pace

  1. The BAFO IPMS anticipated that TAR would commence in January 2014, but the government did not initiate TAR until February 2014, without adjusting for the 42-day delay.

  2. The BAFO IPMS called for just two LRIP systems, but the government ordered two additional LRIP systems.

3. The BAFO IPMS provided for delivery of a fifth system in September 2016, but the government ordered the fifth system to be delivered by November 2015.

4. The government ordered the sixth through fourteenth systems to be delivered four to nine months earlier than shown in the BAFO IPMS.

5. The government ordered the fifteenth through eighteenth systems to be delivered two to three months earlier than shown in the BAFO IPMS.

- Production Sequence

1. The BAFO IPMS provided that LRIP would not begin until TAR was finished, but TAR and LRIP were required to run concurrently.

2. The BAFO IPMS had a three-month break between the end of LRIP and the start of FRP, but the government placed so many orders that appellant was forced to ramp up production and lost this anticipated break.

3. The contract required a baseline configuration be finalized by the end of TAR, but the government ordered multiple configuration changes after TAR.

(Compl. ¶¶ 167-68; *see also* app. br. at 8-24)

16. The contracting officer (CO) responded to the REA on April 18, 2018. The CO acknowledged that the contract varied from the original Request for Proposal Statement of Work and the ordering periods stated in the contract Schedule, Section B. However, the REA response maintained that the changes were implemented via formal, bilateral agreements with appellant's consent. (R4, tab 169 at 1)

17. Appellant requested reconsideration of the REA on August 15, 2018 (R4, tab 170). On September 14, 2018, the CO responded to the request for reconsideration. The CO admitted no liability for the allegations made by appellant but stated that the CO was willing to settle the REA in a manner equitable to both parties. (R4, tab 171)

18. The parties continued to exchange correspondence, including an April 24, 2019, revision to the REA in the amount of $5,903,143. The CO requested that the Defense Contract Audit Agency (DCAA) perform an independent review of the amounts proposed by appellant in its revised REA. (R4, tab 175 at 3) The DCAA audit report, dated January 10, 2020, concluded that appellant's "proposed amounts do

not comply with FAR 52.243-1, *Changes-Fixed Price* and contract terms" (R4, tab 175 at 7). Based on the results of the DCAA audit report, the CO denied the REA in full on January 27, 2020. The CO stated that there was "no financial basis to award Vigor any additional consideration beyond numerous, no cost production delivery order extensions already granted." (R4, tab 173)

19. On February 10, 2020, appellant resubmitted its REA as a certified claim. The claim stated that it was comprised of its REA, request for reconsideration of the REA, and a repricing adjustment prepared in response to the DCAA audit report. (R4, tab 176a) The totaled claimed amount was $5,213,618 (R4, tab 176).

20. On April 23, 2020, the CO issued a final decision denying appellant's claim (R4, tab 177). Vigor timely appealed the decision to the Board on July 15, 2020.

DECISION

*The Parties' Contentions*

Appellant argues that the government constructively changed the contract by accelerating the production pace and sequence through the issuance of delivery orders. Appellant maintains that the BAFO IPMS represented the baseline schedule for production and that the government's delivery orders required Vigor "to fabricate more systems much earlier than specified in the IPMS, necessitating that Vigor perform significant extra work in order to meet the accelerated production schedule." (App. br. at 29-31).

The government maintains that it did not constructively change the contract. Rather, the government argues that the contract schedule, as bilaterally modified by the parties, represented the parties' agreement on delivery dates. (Gov't br. at 76)

*Discussion*

For appellant to demonstrate a constructive change, the burden of proof is on appellant to show: (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government. *Envtl. Chem. Corp.*, ASBCA Nos., 59280, 60760, 22-1 BCA ¶ 38,166 at 185,361 (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014)). In this case, appellant argues that the government altered the contract's requirements through the issuance of delivery orders. Appellant states that these orders: (1) required it to complete TAR and LRIP concurrently rather than consecutively; (2) increased the number of systems it was required to produce during LRIP and eliminated the three-month break that was supposed to follow LRIP; and (3) accelerated the delivery dates of the systems relative to the schedule. (App. br. at 29-30)

8

Appellant maintains that the parties incorporated into the contract the BAFO IPMS, which represented the baseline schedule for production. Appellant notes that the SOW refers to the IPMS as the baseline schedule and that each CLIN was to be performed in accordance with Sections C and J of the contract. (App. br. at 31-32) Section J of the contract, as modified by Modification No. P00010, included the BAFO IPMS (finding 10). Appellant states, "[w]hile the Contract may have entitled the Government to purchase the specified quantities of systems within the enumerated ordering periods, the plain language of the Contract also required that all such systems were to be produced in accordance with the SOW and IPMS" (app. br. at 32).

Conversely, the government maintains that the IPMS deliverable represented appellant's proposed plan to meet its contractual, agreed-to delivery dates. The government argues that the "CDRL A006 IPMS deliverable was . . . part of a broader Government effort to monitor project status and 'evaluate progress towards meeting program objectives', including the contractor's ability to satisfy its contractual delivery date obligations and 'ensure successful program execution'" (gov't br. at 84; *see also* finding 6). The government argues that appellant understood the IPMS's role by acknowledging the requirement to update it throughout the life of the contract (gov't br. at 82; *see also* finding 9). The government notes that appellant in fact provided regular updates to the IPMS (gov't br. at 82; *see also* finding 11). The government states that "[o]nly when later seeking additional compensation from the Government . . . did [appellant] suddenly proclaim that one particular version of its IPMS (the "2013 IPMS" from is BAFO) somehow overrode not only all other IPMS versions, but even the Contract's established delivery schedule . . ." (gov't br. at 86).

This is then a question of contract interpretation, which is a matter of law for this Board to decide. *D&J Machinery, Inc.*, ASBCA No. 62019, 22-1 BCA ¶ 38,118 at 185,165 (citing *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed. Cir. 1993)). "In matters of contract interpretation, the preferred approach is to read the entire contract as a whole, and to give the language of the contract its plain meaning. In doing so, different parts of the contract are to be read in harmony, if possible, and preference is given to an interpretation that gives effect to all the terms of the contract and does not render one or more of them meaningless." *ECC Int'l, LLC*, ASBCA No. 58993 *et al.*, 22-1 BCA ¶ 38,073 at 184,887 (citing *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000); *Christos v. United States*, 300 F.3d 1381, 1384 (Fed. Cir. 2002); *Air-Sea Forwarders, Inc. v. United States*, 166 F.3d 1170, 1172 (Fed. Cir. 1999); *United Pac. Ins. Co. v. United States*, 204 Ct. Cl. 686, 693-94 (1974)). "Further, a contract will be found to be ambiguous if it is susceptible to more than one reasonable interpretation, each of which is consistent with the contract language and the other provisions of the contract." *ECI Constr., Inc.*, ASBCA No. 54344, 05-1 BCA ¶ 32,857 at 162,807 (citing *Lockheed Martin IR Imaging Systems, Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997)). Each interpretation must fall within a "zone of reasonableness." *ECI Constr.*, 05-1 BCA ¶ 32,857 at 162,807 (citing *Metric*

9

*Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999); *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578 (Fed. Cir. 1993); *WPC Enters., Inc. v. United States*, 323 F.2d 874, 876 (Ct. Cl. 1963)).

Here, appellant's interpretation of the contract, specifically the contractual significance of the BAFO IPMS, does not fall within the zone of reasonableness. The Data Description for A006 IPMS plainly explains the purpose of the IPMS. It is a tool used to "reflect[] the [c]ontractor's program and schedule planning." It is "used to verify attainability of contract objectives, and to integrate the program schedule activities with all related components." The contractor must "ensure the IPMS reflects the baseline schedule and all changes thereto and maintain the IPMS throughout the life of the contract." (Finding 6) Section 7.3.2 of the SOW further provides that the contractor "shall ensure the IPMS is up to date and available at all Government meetings" (finding 7). Appellant understood its responsibility to update the IPMS. Appellant's BAFO acknowledged that it would "maintain the IPMS throughout the life of the contract" and "ensure the IPMS is up to date and available at all meetings" (finding 9). Indeed, appellant updated the IPMS several times. The record includes multiple versions of the IPMS that appellant submitted both before and after the BAFO IPMS. (Finding 11) We do not believe it is reasonable to maintain that one specific version of the IPMS, namely the BAFO IPMS, was intended to be the schedule when the contract clearly contemplated that appellant would submit multiple versions of the IPMS over time.

The contract included the schedule in Part I (finding 2). Part I of the contract included Sections B and F (findings 2, 4). Section B established the potential ordering periods for each exercised CLIN. The parties subsequently bilaterally updated the dates for the ordering periods. (Findings 3, 12) The CLINs were to be "set forth under individual delivery order" (finding 3). Section F established delivery information for each CLIN, including delivery dates (finding 4). Appellant places significant emphasis on the fact that Section B incorporates the BAFO IPMS because Section B states that each CLIN was to be performed "in accordance with Sections C and J of the contract" and Section J contained appellant's BAFO IPMS as incorporated by Modification No. P00010 (findings 3, 10). Notably, the contract did not contain a Section C. Rather, the contract included the SOW (which would have been Section C), as Attachment 01 under Section J (*see* n. 2). Reading the contract as a whole in harmony with its different parts, it is clear that the CLINs were to be performed in accordance with Section J (*i.e.*, the SOW). The only reasonable interpretation for the inclusion of the BAFO IPMS in Section J was that it represented appellant's "program and schedule planning" at that time. Furthermore, the parties understood that the IPMS would change over time.

As noted above, each CLIN was to be "set forth under individual delivery order" (finding 3). After the parties bilaterally exercised the options for TAR, LRIP,

and the first FRP ordering period, the government issued delivery orders for CCM Mk 1 systems (findings 10, 13). Notably, most of the delivery orders were also signed by appellant. The government issued seven delivery orders, which established delivery dates for each CCM Mk 1 system. (Finding 13) Appellant acknowledged in its brief that the CO "had contractual authority to issue each of the delivery orders" and that the contract "entitled the Government to purchase the specified quantities of systems within the enumerated ordering periods" (app. br. at 30, 32). Appellant's contention is that the delivery orders differed from what was in the BAFO IPMS. But, again, appellant's interpretation regarding the contractual significance of the BAFO IPMS does not fall within the zone of reasonableness. Therefore, appellant has failed to meet its burden in demonstrating a constructive change to the contract.

Appellant also argues that "[e]ven if the delivery orders were bilateral, they did not cover Vigor's increased costs and would not eliminate Vigor's right to recover an equitable adjustment" (app. br. at 35). In support, appellant cites *Chantilly Constr. Corp.*, ASBCA No. 24138, 81-1 BCA ¶ 14,863. In *Chantilly Constr. Corp.*, the Board allowed the contractor to seek increased costs where "[t]he formal modifications which incorporated the site changes compensated appellant solely for the direct costs of performing the changed work itself and did not cover appellant's increased costs . . . attributable to the delays in the overall project." *Id.* We do not believe *Chantilly Constr. Corp.* is relevant to our analysis here. While *Chantilly Constr. Corp.* involved a demonstrated change to the work itself, Vigor has failed to demonstrate that there was a constructive change to the contract in this appeal. Rather, in accordance with the contract, the government issued delivery orders for CCM Mk 1 systems and when appellant was unable to meet the delivery dates, the parties bilaterally modified the delivery orders to extend the delivery dates (findings 13-14).

Finally, appellant argues that any bilateral modifications are invalid for lack of consideration because "Vigor received no compensation for accepting an accelerated schedule by modification" (app. br. at 37). But, again, appellant has failed to meet its burden in demonstrating that there was an accelerated schedule constituting to a constructive change to the contract. The government did issue delivery orders for CCM Mk 1 systems, and the parties did bilaterally modify those delivery orders to extend the delivery dates (findings 13-14). This does not equate to a constructive

11

change to the contract.  Moreover, appellant received consideration for these bilateral modifications to the delivery orders in the form of extended delivery dates.

CONCLUSION

The appeal is denied.

Dated:  February 22, 2023

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62607, Appeal of Vigor Works, LLC, rendered in conformance with the Board's Charter.

Dated:  February 22, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals